**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CR-00821 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| DEMITREOUS SPRAGGINS and | ) | |
| WALTER WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Demitreous Spraggins and Walter Williams face various drug-trafficking charges. R. 2, Indictment.[1] Spraggins and Williams have filed a joint motion to dismiss Counts 2 and 3 for lack of venue. R. 84, Defs.' Joint Mot. to Dismiss. For the reasons explained in this opinion, the Defendants' motion is denied as to Count 3 (the charge against Spraggins), and the Court reserves its decision on Count 2 (against Williams) because supplemental briefing is needed.

## I. Background

For the purposes of this motion, the Court accepts as true the facts alleged in the indictment and as proffered by the government in its response brief to the Defendants' motion. *United States v. Clark*, 728 F.3d 622, 623 (7th Cir. 2013); *see also United States v. Williams,* 2020 WL 4052145, at *1 (N.D. Ill. July 20, 2020). For the time being, the Court interprets these facts in the light most favorable to the government. *United States v. Tingle*, 183 F.3d 719, 726 (7th Cir. 1999).

---

[1]Citations to the docket are noted as "R.", followed by the docket entry.

The government alleges that Demitreous Spraggins "worked to transport kilograms of cocaine from Los Angeles to Chicago" between July and October 2018. R. 87, Gov't. Resp. at 1. Spraggins relied on his uncle, Walter Williams, to source the drugs from Individuals B and C. *Id.* at 1–2. For transportation, Spraggins relied on an individual who offered the use of his bus to move cash and drugs; unbeknownst to Spraggins, this individual was a cooperating source for law enforcement. *Id.* at 1. During July and August of 2018, Spraggins worked with his brother-in-law, Individual A, and with the cooperating source, to prepare to bring a large load of cocaine from California to Chicago. *Id.* at 2. Conversations recorded by law enforcement show (at least for purposes of this motion) that Spraggins communicated with Williams, who was out in California, to set up the deal. *Id.* at 2–3.

Those are the broad strokes, but some factual detail is needed given the nature of the venue motion and the governing law. On September 4, 2018, Spraggins met the cooperating source at a Chicago restaurant and gave him $75,000 in cash to stash in the bus for the trip to California, where it would be used to pay for the drugs. *Id.* at 5–6. They discussed Spraggins's plan to fly to Los Angeles the next day, as well as the details of the deal with Williams. *Id.* at 6. After they parted, the cooperating source showed the money to law enforcement officers. *Id.* at 7. Then he went to the location where his bus was parked, where he met Individual A and gave him instructions on how to drive it. *Id.* Individual A then set off for Los Angeles. *Id.*

On September 6, 2018, Spraggins allegedly flew from Chicago to Los Angeles to complete the drug deal. Gov't. Resp. at 8. In Los Angeles, he drove a rented white

Mercedes to Williams's home and went inside. *Id.* at 8, 10. About an hour later, he and Williams drove the Mercedes to a Target parking lot in Hawthorne, California. *Id.* There, they met with Individuals B and C, who got into the car with Spraggins. *Id.* The next day, September 7, Spraggins spoke on the phone with the confidential source. *Id.* Spraggins explained that Williams's suppliers were not ready with the drugs yet, and the two men made a plan for the source to bring the $75,000 buy-money to Spraggins's room the next day, after Individual A arrived in Los Angeles. *Id.* at 8–9. The source brought the cash to the room the next day (September 8) as planned. *Id.* at 9–10.

On September 8, after receiving the drug-buy money from the confidential source, Spraggins drove to a grocery store parking lot where Williams was waiting in his car with Individuals B and C. Gov't. Resp. at 10. Spraggins got into Williams's car, and then Individuals B and C got out of the car and drove their own car to the U.S.–Mexico border. *Id.* But they did not return quickly. On September 10 and 11, Spraggins and the confidential source "had several recorded conversations about the status of the cocaine transaction." *Id.* Spraggins told the confidential source he would leave the drug money in the rented Mercedes in Williams's garage. *Id.* On September 11, the confidential source had a recorded conversation with Williams about the drug deal. *Id.* It emerged that Williams's suppliers were willing to pay Spraggins for the delay in the drug delivery. *Id.* at 10–11. Williams also gave the confidential source $2,500 to cover his expenses in California. *Id.* at 11. Meanwhile, Spraggins flew back to Chicago on September 11. *Id.* Later that day, the confidential source spoke with

Spraggins, now in Chicago, and Spraggins modified his cocaine order. *Id.* at 14. Between September 12 and 20, Williams and the confidential source continued to tweak the details of the deal in Los Angeles, while Spraggins waited in Chicago. Gov't. Resp. at 14–17. During this time, Spraggins had several recorded conversations with the confidential source about the deal. *Id.*

On September 20, 2018, Spraggins flew from Chicago back to Los Angeles. Gov't. Resp. at 17. The next day, Williams picked Spraggins up from his hotel and drove him to a T-Mobile store, then to a Target parking lot in Hawthorne. *Id.* at 17–18. Individuals B and C got into Williams's car and got out a few minutes later carrying a shopping bag. *Id.* at 18. The day after, now September 22, Williams met with Individuals B and C at a restaurant in Inglewood, California. *Id.* Spraggins arrived in a white Mercedes, and "turned it over to either Individual B or C, who departed the parking lot in the car." *Id.* Law enforcement followed the Mercedes—but apparently the officers were spotted, because the driver parked and abandoned the car off a highway exit, throwing the keys into the bushes. *Id.* Law enforcement executed a warrant to search the Mercedes's trunk, finding a suitcase with over $400,000 in cash. *Id.*

In the evening of September 22, Williams and the confidential source met in Williams's car in another parking lot. Gov't. Resp. at 19. In a recorded conversation, they discussed the drug-buy gone wrong. *Id.* Later, the confidential source talked to Spraggins, who told him, in a recorded call, more about what had happened. *Id.* at 20. The original plan had been for the drug suppliers to count the money, then replace

it with drugs in the trunk of the Mercedes and return the car to Spraggins. *Id.* But they had been spooked by a car on their tail (rightly so, as it turns out), leading them to abandon the Mercedes on the side of the road and tell Spraggins its location and the keys' location so he could go reclaim it and the money. *Id.* When Spraggins gained access to the car, he found no money and no drugs. *Id.*

All this led up to the drug-trafficking charges in this case. At issue in this motion are Counts 2 and 3. Count 2 is a conspiracy charge leveled against Williams, alleging that starting "on or about September 6, 2018, at Chicago, and continuing until on or about September 22, 2018, in the Northern District of Illinois, Eastern Division, and elsewhere, WALTER WILLIAMS, aka 'Unc,' … did conspire with Individual B and Individual C … to knowingly and intentionally possess with intent to distribute and distribute a controlled substance …." Indictment at 2.

Count 3 names Spraggins in an attempted-possession drug charge: "On or about September 22, 2018, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, DEMITREOUS SPRAGGINS, aka 'Meech,' … herein, did attempt to knowingly and intentionally possess with intent to distribute a controlled substance …." Indictment at 3.

## II. General Standard for Venue

The Constitution requires that the federal government charge crimes only in the state and district in which the defendant committed the charged offense. U.S. Const. Art. III, § 2, cl. 3; *see also* Fed. R. Crim P. 18. Relatedly, the Sixth Amendment gives defendants "the right to a speedy and public trial, by an impartial jury of the

State and district wherein the crime shall have been committed ....” U.S. Const. Amend. VI. Under Federal Rule of Criminal Procedure 12(b)(1), “[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits.” This includes the defense of improper venue. Fed. R. Crim. P. 12(b)(3)(A)(i). But the government must only prove venue by a preponderance of the evidence because venue is not an element of the offense. *See U.S. v. Muhammad,* 502 F.3d 646, 652 (7th Cir. 2008). The government may rely on direct or circumstantial evidence to establish venue. *Id.*

### III. Analysis.

### A. Pretrial Motions on Venue

Before addressing whether venue is proper on each challenged count, it makes sense to address—and to reject—two threshold arguments made by the government. First, contrary to the government’s argument that venue is a question exclusively for the jury to decide, Gov’t. Resp. at 25, it is appropriate to take up the Defendants’ challenge to venue at this stage of the litigation. A defendant’s right to be tried in the proper venue is enshrined twice in the Constitution. U.S. Const. Art. III, § 2, cl. 3; *id.* Amend. VI. Each defendant has the right to be protected “from prosecution in a place far from his home and the support system that is necessary to mount an adequate defense.” *Muhammad*, 502 F.3d at 651. Indeed, Criminal Rule 12(b)(3)(A)(i) explicitly lists “improper venue” as a motion that actually “*must* be made before trial” if the basis for the motion is “reasonably available” before the trial and the Court can decide

6

it without a full-blown "trial on the merits," Fed. R. Crim. P. 12(b)(3) (emphasis added).

Although the Seventh Circuit in *Muhammad* did write that "venue is ordinarily a question of fact for the jury to decide," it went on to explain that "the defendant must, by his factual submissions, make venue a serious issue." *Id.* at 656 (cleaned up). Indeed, in *Muhammad*, the district court had denied the defendant's motion to dismiss for lack of venue, then denied the defendant's request to issue a jury instruction on the question of venue. *Id.* at 655–56. The Seventh Circuit held that while it would have been best practice to issue the jury instruction, "failure to do so in this case was not error." *Id.* at 656. This is because "even if a defendant properly objects to venue … it does not become a fact question for the jury unless the defendant also places it in issue by establishing a *genuine* issue of material fact with regard to venue." *Id.* (emphasis in original) (cleaned up). In other cases, too, the court alone has addressed venue, without taking the time and resources of a jury. *See, e.g., United States v. Clark*, 728 F.3d 622 (7th Cir. 2013).

Here, in this case, it makes sense to address the venue question now. The parties have already exchanged discovery and can speak to the propriety of venue in this District, and can do so now before substantial pretrial preparation. The alternative would be to risk the waste of significant resources, including a jury's time, to try charges in this District that should never have been brought here in the first place.

Second, the Government cannot establish venue simply by obtaining an indictment that says a crime took place "at Chicago," as it tries to argue in its brief. Gov't.

Resp. at 24–25; Indictment at 2, 3. "An indictment alleges proper venue when it alleges facts which, if proven, would sustain venue." *United States v. Bohle*, 445 F.2d 54, 59 (7th Cir. 1971), overruled on other grounds by *United States v. Lawson*, 653 F.2d 299, 301 (7th Cir. 1981). At this stage, the Court accepts as true the factual allegations in the indictment and the facts proffered in the government's brief. But the phrase "at Chicago," standing alone, is not sufficiently detailed and concrete to tie actual proposed facts to the venue of Chicago.[2] It is worth noting that if the Court determines that venue is proper based on the facts in the government's brief, but the government fails to prove those facts at trial by a preponderance of the evidence, then the defendants may renew their venue objections.

---

[2]In support of its position that venue is proper based on the phrase "at Chicago," the government cites three cases that originate outside the Seventh Circuit and are distinguishable from the case at hand. Gov't Resp. at 24. In *United States v. Bellomo*, the indictment included details about how "the named defendants conspired to violate the Hobbs Act … by obtaining money from businesses operating at the piers of the New York area," and additional facts linking the crime Eastern District of New York. 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) (cleaned up). The government in *Bellomo* did not rely exclusively on the indictment's conclusory assertion that the crime took place in the district. In *United States v. Stein,* the indictment alleged venue by setting forth in detail the type of tax fraud each defendant committed in the district—again, the government did not seek to rely on bare-bones language then as it does now. 429 F. Supp. 2d 633, 643–44 (S.D.N.Y. 2006). Finally, in *United States v. Engle*, the Fourth Circuit did (at first) generally rely only on indictment language alleging that the defendant enticed a minor to engage in sexually explicit conduct "in the Eastern District of Virginia and elsewhere." 676 F.3d 405, 415–16 (4th Cir. 2012). But the Fourth Circuit went on to analyze venue based on facts outside the bare allegation in the indictment. *Id.* 416–19.

### B. Spraggins

The Defendants' joint motion to dismiss Counts 2 and 3 relies on the same arguments and reasoning for each defendant, but their charged offenses are too different to be analyzed together. The Court begins with Spraggins, because Seventh Circuit case law makes the outcome of his motion clear: it must be denied.

Demetrius Spraggins stands charged with the "attempt to knowingly and intentionally possess with intent to distribute" more than five kilograms of cocaine, in violation of Title 21 U.S.C §§ 841(a)(1) and 846. Indictment at 3. He allegedly committed the offense on or around September 22, 2018. *Id.* Even if Spraggins was physically present in California on that date, venue is proper in the Northern District of Illinois.

To start, 21 U.S.C. §§ 841 and 846 do not have crime-specific venue provisions, so this Court must determine the correct venue for Spraggins's charge by using "as a general guide the nature of the crime alleged and the location of the act or acts constituting it." *Muhammad*, 502 F.3d at 652 (cleaned up) (citing *United States v. Cabrales,* 524 U.S. 1, 6 (1998) and *United States v. Anderson*, 328 U.S. 699, 703 (1946)). This guide can also be "described as a substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for suitable fact-finding." *Id.* (citing *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). In considering Spraggins's offense, the key case in the Seventh Circuit

9

is *United States v. Muhammad*, a case concerning venue for the exact same crime charged against Spraggins, on very similar facts.

In *Muhammad*, the defendant hatched a plan to distribute drugs while living in Milwaukee, then traveled to Phoenix to execute this plan. *Muhammad*, 502 F.3d at 648–49. In Phoenix, he obtained cocaine, which he planned to sell in Milwaukee. *Id.* at 649. He arranged for two women to fly from Milwaukee to Phoenix, and then rented two cars so that the women could drive back to Phoenix with three kilograms of cocaine in their trunk, while Muhammad and an accomplice followed behind. *Id.* at 649. But the cocaine did not make it to Milwaukee: along the way, the cocaine was seized by law enforcement in Texas. *Id.* Muhammad was charged in the Eastern District of Wisconsin with "attempt to possess and to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)," in violation of 21 U.S.C. § 846 (the statute prohibiting the attempt). *Id.* at 647, 652. Like Spraggins, Muhammad planned his crimes in the district where he was ultimately charged, and where he planned to sell the drugs. Like Spraggins, Muhammad bought drugs out-of-district and they were intercepted by law enforcement out-of-district. The Seventh Circuit held that venue was proper against Muhammad. *Id.* at 654.

The Seventh Circuit looked first at the "nature of the crime alleged." *Muhammad*, 502 F.3d at 652. *Muhammad* followed the First Circuit's lead in examining "the key verbs" in the statutes underlying the charges. *Id.* The key verbs from Section 841 (the substantive offense that was attempted) were, of course, "possess" and "distribute." *Id.* at 653. The key verb from Section 846 was "attempt." *Id.* The Seventh Circuit

10

noted that "an attempt is an inchoate crime [that] does not require the completion of the underlying offense." *Id.* Meanwhile, "distribution and possession with intent to distribute are continuing crimes." *Id.* Congress has legislated on the issue of continuing crimes: "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a).

The Seventh Circuit looked next at the location of the crime. *Muhammad*, 502 F.3d at 653. Muhammad's drug scheme "began in the Eastern District of Wisconsin, drew upon resources from the Eastern District of Wisconsin for supplemental support, and was, without any doubt, intended, from its very beginning, to have its sole effect in the Eastern District of Wisconsin." *Id.* at 654. The same could be said for Spraggins, substituting the Northern District of Illinois for the Eastern District of Wisconsin. Spraggins planned his drug deal from Chicago and intended to distribute the drugs from and in Chicago. Gov't. Resp. at 2.

After considering the nature of the charged offense and the locations of Muhammad's activities, the Seventh Circuit concluded that venue was proper in the Eastern District of Wisconsin. *Muhammad*, 502 F.3d at 654–55. The Seventh Circuit agreed with the Second Circuit that a district where a crime is intended to have an *effect* is "entitled to consideration for venue purposes," and that both the definition and the nature of a crime may implicate the crime's intended effects. *Id.* at 654 (citing *Reed*, 773 F.2d at 482). It was crucial that Muhammad had been trying to possess

11

cocaine in order to sell it in Wisconsin. *Id.* The Seventh Circuit also paid close attention to the *planning* of the crime in Wisconsin, noting that Muhammad "recruited the assistance of [an accomplice] and made some purchases to use in the execution of the plan." *Id.* He also orchestrated and executed a plan involving using two women from Milwaukee as "mules" to transport the drugs back to Wisconsin. *Id.* at 655. The Seventh Circuit also noted that some crimes can be prosecuted in multiple districts, so that even if Muhammad could also have been prosecuted in Texas or Arizona, prosecution in Wisconsin was also allowed. *Id.* at 654. Because Muhammad's attempt to possess and distribute drugs was so clearly aimed at doing so in Wisconsin, and because he took so many steps both *in* and aimed *at* Wisconsin to turn the attempt into reality, the Seventh Circuit concluded that venue was appropriate in Wisconsin. *Id.* at 654–55. (It also mattered that practical considerations supported the choice of venue, with many witnesses based in Wisconsin. *Id.* at 655.)

Just as venue was proper for Muhammad in Wisconsin, it is proper for Spraggins in the Northern District of Illinois on the facts proffered by the government. Spraggins, too, took several planning steps in Chicago. He designed an elaborate plan that involved accomplices from Chicago traveling to California with cash to pick up the cocaine and transport the cocaine back to Chicago. His actions were all aimed at possessing cocaine in Chicago and then further distributing it here. Yes, on September 22 he was in California, but he was engaged in a nearly-carried-out *attempt* to possess and distribute drugs in Chicago. If venue in Wisconsin was appropriate for Muhammad, venue in Illinois is appropriate for Spraggins.

12

It bears noting that Spraggins makes no real effort to distinguish his case from *Muhammad*, instead arguing that his case resembles another Seventh Circuit case where venue was found improper: *United States v. Tingle,* 183 F.3d 719 (7th Cir. 1999). Defs.' Joint Mot. at 8–10. Deborah Tingle ran a drug-distribution operation from her home in Chicago. *Tingle,* 183 F.3d at 723. She would front drugs to individuals who retrieved them from her home, then sold them in Racine, Wisconsin and paid her out of their profits. *Id.* Eventually, the police caught members of the conspiracy with crack cocaine in Wisconsin. *Id.* Tingle was indicted in the Eastern District of Wisconsin on one count of conspiring to distribute cocaine, and one count of distributing cocaine. *Id.* She was convicted on both counts and challenged only the distribution charge, arguing venue was improper. *Id.* Tingle had been charged with distributing cocaine to a man named Rathers, *in Wisconsin*, although in reality she had distributed to Rathers in Chicago, and he had distributed it further to a man named Judon in Wisconsin. *Id.* at 727. The Seventh Circuit held that venue was improper in Wisconsin for the distribution charge, because no element of that charge took place in Wisconsin (remember that the charge *mistakenly* alleged that Tingle distributed the cocaine in Wisconsin). *Id. Tingle* noted, however, that "if the indictment had alleged that Tingle had distributed cocaine base to Allen Judon (or others) in the Eastern District of Wisconsin, venue would have been proper there, *regardless of the fact that Tingle never left Illinois*." *Id.* (emphasis added). So *Tingle* did not establish a rule protecting defendants from prosecution in venues that they have never visited.

13

The facts underlying Spraggins's charge differ dramatically from those underlying Tingle's charge. Tingle was charged with a count of distribution, and her distribution *to Rathers* had taken place entirely in Chicago, rendering venue improper in Wisconsin. *Tingle*, 183 F.3d at 727. By contrast, Spraggins is charged with an *attempt* to possess and distribute cocaine. Indictment at 3. His *attempt*, as already discussed, began in Chicago and was intended to end in Chicago.

Spraggins argues that his acts in Chicago were merely preparatory and do not establish venue here, again citing *Tingle*. Defs.' Joint Mot. at 9. Muhammad made this same argument, also based on *Tingle*, and the Seventh Circuit rejected it. *Muhammad*, 502 F.3d at 654. It is true that the Seventh Circuit stated in *Tingle* that an act that is merely "preparatory" to an offense does not count to establish venue. *Tingle*, 183 F.3d at 726. In *Muhammad,* the Seventh Circuit explained that whereas in *Tingle*, "the Government … failed to demonstrate that *any* activity involving that particular count occurred in Wisconsin," Muhammad was faced with an attempt count and overwhelming evidence that "*all* of his efforts were aimed at his possessing that cocaine in Wisconsin." *Muhammad*, 502 F.3d at 654 (emphasis in original). The "preparatory acts" rule applied in *Tingle* thus did not help Muhammad. Similarly, Spraggins's efforts were aimed at possessing and distributing cocaine in Chicago. Acts like communicating with Williams to set up the deal, obtaining a transport bus, and handing somebody drug-buy money, are all important parts of the attempt—not merely preparatory. Indeed, even if Spraggins had never gone to California and bought the cocaine, just giving somebody thousands of dollars with the intent that

14

they use it to buy cocaine would have constituted an attempt. On September 22, when he attempted to complete the drug purchase in California, he was doing so with an aim to selling those drugs in Chicago. For all these reasons, venue is proper in the Northern District of Illinois on Count 2, so Spraggins must fact that charge here in this District.

### C. Williams

The question of proper venue for the charge against Williams is a tougher call. Williams is charged with conspiracy to "possess with intent to distribute and distribute" more than five kilograms of cocaine, in violation of Title 21 §§ 841(a)(1) and 846. Indictment at 2. Conspiracy is another "continuing crime," which means it can be charged anywhere the conspiracy "was begun, continued, or completed." 18 U.S.C. § 3237(a). Applied to conspiracy charges, "the traditional rule is that a conspiracy charge may be tried in any district in which an overt act of the conspiracy occurred." *United States v. Ochoa*, 229 F.3d 631, 636 (7th Cir. 2000). To be clear, like other continuing crimes, a conspiracy charge may be properly venued in more than one judicial district. *Id.*; *Muhammad*, 502 F.3d at 654. And a defendant need not ever have been physically present in a district for venue to be proper there, because again where the crime's *effect* would be felt is important: "[s]o long as an overt act in furtherance of the conspiracy is intended to have an *effect* in the district where the case is finally brought, venue is proper." *United States v. Brown*, 739 F.2d 1136, 1148 (7th Cir. 1984) (emphasis added). This inquiry into the intended effects of a crime can be understood as part of the application of a "substantial contacts rule that takes into account a

15

number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus and effect of the criminal conduct, and the suitability of each district for suitable fact-finding." *Muhammad*, 502 F.3d at 652. It bears repeating that this substantial contacts rule is not rigid, but more of a "general guide" for courts to follow in analyzing venue. *Id.* at 655.

Applying that framework, the first look is at the nature of the charge. Williams is charged with conspiring with Individuals B and C to possess and distribute cocaine. Indictment at 2. Individuals B and C are not charged in the indictment. Their involvement with the drug deal took place in California and, apparently, Mexico. Gov't Resp. at 8–10, 15, 18–20. Once again, "possess" and "distribute" are the key verbs in Section 841, and "conspire" is the key verb in Section 846. Given that a conspiracy is simply an agreement to violate the law, the breadth of the crime's nature—an agreement—covers a relatively wide scope of conduct.

Next up is the location of Williams's acts in furtherance of the alleged crime, and the location where the crime was intended to have an effect. The object of the conspiracy between Williams, and Individuals B and C, was to sell drugs to Spraggins in California. *Id.* 18–20. The acts that they took in furtherance of their conspiracy—meeting with each other and with Spraggins, picking up cash from Spraggins, driving away in the Mercedes—all took place in California. *Id.* at 8–10, 15, 18–20. Williams's goal was to briefly possess the cocaine in California, where he would then distribute it to Spraggins. *Id.* Although Spraggins had plans to take the drugs elsewhere,

16

Williams's conspiracy would have been over when he sold the cocaine to Spraggins in California.

The government argues that venue is proper in Illinois on the theory that Williams intended the drug sale to have its effect in Chicago, where he knew Spraggins would re-sell the drugs. Gov't. Resp. at 25–26. It is true that conspiracies can be broad in scope and can be properly venued in multiple districts. But this conception of venue is expansive and the government's cited cases are different from the one at hand. The government relies primarily on *United States v. Firtash,* 392 F. Supp. 3d 872 (N.D. Ill 2019). In *Firtash*, the defendants were accused of conspiring to use U.S. financial institutions "to bribe Indian public officials" with the goal of mining titanium to sell to a Chicago company. *Firtash*, 392 F. Supp. 3d at 877. The acts that made up the conspiracy took place in multiple states and, in large part, abroad. *Id.* at 877–78. But the object of their conspiracy was to sell a product to a company with its principal place of business in Chicago. *Id.* at 881. The very intent of the conspirators was to complete a transaction with that Chicago company. *Id.* So the district court concluded that the intended-effects test was satisfied. *Id.*

In contrast, the object of Williams was to sell cocaine to Spraggins in California, and Williams very nearly executed the sale—in California. Gov't. Resp. at 18–20. It is true that Spraggins was based in Chicago and no doubt that Williams knew that Spraggins would take the cocaine back to Chicago and sell it there. But on the current record, it is not at all clear that those facts are enough to liken the case to *Firtash*. In that case, *all* of the conspirators allegedly engaged in crimes all intended to

17

consummate a sale to a Chicago-based company, which literally was fixed in Chicago via its principal place of business here. *Firtash*, 392 F. Supp. 3d at 881. But in Williams's case, there is very little information about what Individuals B and C—the alleged coconspirators—knew or intended about Spraggins and the cocaine's ultimate destination. Even if Williams knew or intended the effect of the cocaine distribution to be in Chicago, a conspiracy is an *agreement*, and it is not at all clear that a single conspirator's intent on the crime's effect is enough to establish venue. Put another way, if Individuals B and C could not care less about the destination of the cocaine, then deeming venue as proper in Illinois would not seem to match the agreement

The government also cites *Muhammad* for the proposition that venue is proper wherever an overt act was intended to have an effect. Gov't. Resp. at 25. But *Muhammad* mentions this consideration only in passing—in a parenthetical, no less—and the opinion's overall fact analysis looked at much more than just the drugs' destination in Wisconsin. *Muhammad*, 502 F.3d at 655. If the government's sweeping proposition were true, then the opinion could have just stopped there. Instead, the Seventh Circuit discussed how the "criminal undertaking" had begun in the Eastern District of Wisconsin and drawn upon resources from that District. *Id.* at 654. Also, Muhammad himself was based in Wisconsin and planned to sell in Wisconsin. *Id.* at 648–49. Muhammad's analogue in this case, as already discussed earlier, was Spraggins—not Williams. The Seventh Circuit was not asked to address whether the person who sold Muhammad drugs in Phoenix could be charged in Wisconsin—*that* person would

be analogous to Williams. Nothing in *Muhammad* suggests that the Arizona supplier would have been properly charged in Wisconsin.

Finally, the government also cites a Second Circuit case in support of its version of the intended effects rule, *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985). *Reed* addressed the correct venue for a perjury charge, in which the alleged perjury had taken place during a deposition taken in California, intended to affect a court proceeding set to take place in New York. *Reed*, 773 F.2d at 479. The deponent was told he was being deposed under the rules of the New York court. *Id.* On those facts, the Second Circuit not surprisingly concluded that venue was proper both in the District where the deposition was taken *and* in the District where the underlying "parent proceeding" was pending. *Id.* at 483. *Reed* reasoned that when Congress passed the anti-perjury statute at issue, Congress "was particularly concerned with deterring perjurious testimony in pending proceedings." *Id.* The bill had been specifically modified to include not only court testimony, but "ancillary proceedings such as depositions." *Id.* So *Reed* had a statutory textual basis for its reasoning, whereas there is nothing similar in 21 U.S.C. § 846 that would cover the conspiracy charge against Williams.

Meanwhile, at least two cases from other Circuits involve facts much closer to the facts here, and suggest that venue in this District may be improper. In one case, a medical doctor was charged with conspiring to distribute, and to possess with the intent to distribute, controlled substances in violation of 21 U.S.C. §§ 841, 846—the same charge leveled at Williams (though quite different controlled substances).

19

*United States v. Niamatali*, 712 F. App'x 417 (5th Cir. 2018) (unpublished opinion).
Niamatali was a doctor who operated two clinics in the Northern District of Texas,
from which he prescribed a large volume of controlled substances. *Id.* 418. Some of
his patients lived in, and had their prescriptions filled in, the Eastern District of
Texas. *Id.* at 421. Niamatali knew that he had patients who lived in the Eastern District of Texas. *Id.* Nevertheless, the Fifth Circuit held that venue was *not* proper in
the Eastern District of Texas. *Id.* at 422. *Niamatali* pointed out that the object of the
conspiracy was "to profit from the illicit purchase and selling of controlled substances." *Id.* at 420 (cleaned up). The opinion focused on the actual participants in
the conspiracy—Niamatali and his staff—and noted that they profited when patients
paid before visiting the clinics. *Id.* at 422. Although the patients *later* filled the prescriptions in the Eastern District, this had no impact on the conspiracy itself: "The
profit from the office visits was obtained regardless of whether patients actually got
any prescriptions filled." *Id.* The government argued that Niamatali knew that his
conspiracy could succeed only if addicts got their fix and came back for more, but the
Fifth Circuit disagreed, and discussed substantial evidence that Niamatali over-prescribed drugs as part of a large, otherwise legitimate medical practice. *Id.*

*Niamatali* bears some resemblance to Williams's case, though there are of
course also differences. On the one hand, both defendants were charged with conspiring to sell drugs, and all members of the conspiracy worked to complete the sales in
one district, although the defendants knew that the drugs would be subsequently
taken to (or obtained in, as to *Niamatali*) to another district. On the other hand, in

20

*Niamatali*, there was no reason for the doctor's-office conspirators to think that the patients were going to further resell the drugs in the patients' home districts. So even if the patients felt the ill effects of the drugs in their home districts, it is not as if the primary effect of the conspiracy—to make profit from the prescription writing—was felt outside the doctor's home district. Having said that, there is again very little in the current record on what Individuals B and C intended—or even knew—about the effect of the conspiracy.

The other out-of-Circuit case is *United States v. Williams,* 274 F.3d 1079 (6th Cir. 2001). In *Williams*, the defendant was charged with and convicted of "conspiracy to possess with intent to distribute marijuana"—again, the same charge leveled at Williams in this case. *Id.* at 1080. The *Williams* defendant and his coconspirators planned and completed a drug sale in Texas, but he was charged in Michigan. *Id.* at 1081. He challenged venue. *Id.* The government argued that venue was proper in Michigan because the informant who set up the drug buy had told the defendant that he planned to re-sell the drugs in Michigan. *Id.* at 1084. The Sixth Circuit held that venue was not proper in Michigan and transferred the case to Texas. *Id.* at 1083. *Williams* pointed out that government agents cannot be conspirators, meaning that Williams and his co-defendant were the only conspirators. *Id.* at 1084. Even viewing the evidence in the light most favorable to the prosecution, the Sixth Circuit reasoned, "The evidence shows, at most, that Williams and [his coconspirator] Del Bosque agreed to a drug transaction that began, was consummated, and ended in Texas." *Id.* It is true that, unlike the defendants in *Williams*, the Williams now before this Court

21

had a link to this District that did not rely on a government agent, namely, his nephew and customer, Spraggins. But no one thinks that Spraggins was anything more than just that—a customer, not a coconspirator. Williams, like his Texas namesake in the Sixth Circuit case, "agreed to a drug transaction that began, was consummated, and ended" in one state: California. So the Sixth Circuit's reasoning suggests that venue may not be proper in Illinois as to Williams.

The upshot of all this is that the government and Williams must file supplemental briefs in light of the incompleteness of the legal and factual arguments to date (and the Court recognizes that neither side cited *Niamatali* or *Williams*). The supplemental briefs must address (1) whether, as a matter of law, the intended-effects test must take into consideration the knowledge and intent of coconspirators (that is, Individuals B and C);[3] and (2) whether, as a matter of fact, there are other facts that the government or the defense can point to that either supports or refutes the knowledge and intent of Individuals B and C as to the effects in Illinois.

### 1. Phone Calls

There is a third specific topic that the parties must address in their supplemental briefs. Some cases suggest that if Williams made a phone call into this District during the time of the alleged conspiracy, and the call was in furtherance of the conspiracy, he could be properly charged here. The Seventh Circuit approved venue in a

---

[3]It might be that conspiratorial liability under *Pinkerton* should be considered when deciding venue, but the absence of briefing on this emphasizes the importance of supplemental filings.

district in which victims of a crime were located when the defendants called them, even though the defendants never set foot in the district. *United States v. Brown,* 739 F.2d 1136, 1148 (7th Cir. 1984). *Brown* approvingly cited an Eleventh Circuit case that deemed a "phone call from defendant in Florida to Texas sufficient to establish venue in Texas." *Id.* (citing *United States v. Lewis*, 676 F.2d 508, 511 (11th Cir. 1982)). In *Brown*, it must be said, there were additional facts to support venue in the Central District of Illinois, including money transfers from that District, but the phone call appears to have played a key role in the Seventh Circuit's decision. *Id.*

Other circuits have also held that a telephone call can sometimes establish venue. The Second Circuit held that "phone calls from one district into another can establish venue in the latter district so long as they further the ends of the conspiracy." *United States v. Naranjo,* 14 F.3d 145, 147 (2d Cir. 1994); *see also United States v. Rommy*, 506 F.3d 108, 120–21 (2d Cir. 2007) (reaffirming *Naranjo*).[4] It is worth noting that it did not matter in that case that the person receiving the calls was *not* a coconspirator. *Id.* The Fifth Circuit has also reasoned similarly, holding that venue was proper in the Western District of Texas for defendants who conducted a drug sale in Missouri, because an uncharged member of their conspiracy reached out to one of

---

[4]Both *Naranjo* and *Rommy* qualify their holdings by stating that telephone calls made venue proper "at least in the absence of unfairness or hardship to the defendant arising from trial in that district, or artificial creation of venue in that district by the Government." *Naranjo*, 14 F.3d at 146, *Rommy*, 506 F.3d at 120. Spraggins and Willims do not argue artificial creation of venue. Williams does appear to argue that prosecution in Illinois would be a hardship, because he is elderly and lives in Georgia. Defs.' Joint Mot. at 2. But this case could definitely not be brought in Georgia. So if this Court dismisses the charge against Williams, he will likely be charged again in California, even farther away from his new home. His hardship argument thus does not affect this Court's reasoning.

the conspirators from El Paso, Texas. *United States v. Thomas,* 690 F.3d 358, 369 (5th Cir. 2012).

That a phone call into a district establishes venue there does make a certain amount of sense. After all, if Williams had flown into Chicago to further the conspiracy, then venue would obviously be proper here. If he made a phone call into Chicago to promote the conspiracy, then arguably he was also present in this district, albeit by remote means.

Usually, federal courts are wary of raising issues and arguments not presented by the parties. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). None of the parties has mentioned or briefed the specific question of whether Williams had any telephone contacts that could support venue in this District. But obviously the Defendants have challenged venue and the government has mounted an extensive objection, including by arguing that Williams knew that the cocaine would be sold in Chicago. The issue of how Williams's contacts with Chicago might affect venue is thus generally on the table. With regard to the importance of phone calls into the District, that is one of those "circumstances in which a modest initiating role for a court is appropriate." *Id.* If the government can proffer facts showing that Williams made calls to Spraggins in Chicago during the time in which he is charged with conspiracy, then that might be enough to establish venue.[5] Of course, both sides

---

[5]Williams is accused of conspiracy between September 6 and 22, 2018. Indictment at 2. The government's brief suggests that he had phone calls with Spraggins in July and August, but does not mention any calls during the period of the charged conspiracy. Gov't. Resp. at 2–3.

should have the chance to brief this issue too, so it is the third topic of the supplemental briefs.

## IV. Conclusion

For the reasons discussed above, the Court denies the motion to dismiss Count 3 against Spraggins for improper venue. To help the Court decide what should happen to Count 2 against Williams, the parties shall file supplemental briefs addressing (1) whether, as a matter of law, the intended-effects test must take into consideration the knowledge and intent of coconspirators (that is, Individuals B and C); (2) whether, as a matter of fact, there are other facts that the government or the defense can point to that either supports or refutes the knowledge and intent of Individuals B and C as to the effects in Illinois; and (3) whether Williams made any phone calls into the District in furtherance of the conspiracy during the charged time period of the conspiracy, and whether (as a matter of law) that matters. It makes sense for the government to file first (it bears the burden on venue), so the government's opening supplemental brief is due by October 4, 2021. Williams's supplemental response is due by October 18, 2021. The government's supplemental reply is due by October 25, 2021.

On the case against Spraggins, the defense counsel and the Defendant shall confer on the direction of the case, and then confer with the government. The government and Spraggins shall file a joint status report on October 1, 2021. To track the case only (no appearance is required), a tracking status hearing is set for October 8, 2021, at 8:30 a.m. Under the Speedy Trial Act, time is excluded through at least

October 25, 2021, the deadline for the reply on the remaining aspect of the pending motion, for consideration of the motion, 18 U.S.C. § 3161(h)(1)(D).

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 20, 2021

26